[Philadelphia, February 2, 1832.]

## WERKHEISER *against* WERKHEISER and others.

### APPEAL.

The presentation of a petition to the Orphan's Court, setting forth, that the petitioner's father died seized of the premises therein described, leaving a widow and seven children, and praying the court to award an inquest to make partition, &c. does not estop the petitioner from afterwards maintaining an ejectment for the same premises, and proving, that they were the estate of his mother, who was his father's first wife, and descended to him as her heir, to the exclusion of his brothers and sisters, the children of a second wife.

A plaintiff, who claims under an equitable title must do equity before he can recover in ejectment.

Where, therefore, the defendant has acted with good faith, he is entitled to be re-embursed the money he has expended in perfecting the title and making improvements, but if he has acted *mala fide,* and endeavoured to defraud the plaintiff, he is not entitled to the benefit of this principle, or if he be entitled to any thing, it is only to the balance, which may appear to be due after deducting the rents, issues and profits during the time he enjoyed the land.

This was an action of ejectment for a tract of land, situated in *Hamilton* township, in *Northampton* county, containing two hundred and fifty acres or thereabouts, brought by *George Werkheiser* against *Margaret Werkheiser,* widow of *Charles Werkheiser,* and the minor children of the said *Charles Werkheiser,* who appeared by their

(Werkheiser *v.* Werkheiser and others.)

guardians. The cause was originally instituted in the Court of Common Pleas of *Northampton* county, and removed by the plaintiff to the Circuit Court.

On the trial before Judge Huston, at *Easton*, on the 8th of *April*, 1831, the counsel for the plaintiff, having stated in his opening, that the plaintiff claimed the premises in dispute, as an inheritance from his mother, who was a daughter of *Barnet Fenner*, who died in the year 1804, leaving two children, to wit, *Henry* and *Margaret*, who intermarried with *Charles Werkheiser*, and whose only surviving child was the plaintiff, proposed to show his title. To this the counsel for the defendants, objected on the ground, that by certain proceedings in the Orphan's Court of *Northampton* county, at *January* and *April* terms, 1828, *George Werkheiser*, the plaintiff, was estopped from maintaining this action, or from denying, that *Charles Werkheiser* was in his lifetime seized in his demesne as of fee of the property in dispute; that he died intestate seized thereof, and that it descended to all his children as tenants in common.

It appeared, that at *January* term, 1828, *George Werkheiser*, the present plaintiff, presented a petition to the Orphan's Court of *Northampton* county, in the usual form, setting forth, that the petitioner's father, *Charles Werkheiser*, died intestate, leaving a widow and seven children, and seized of the real estate described in the petition, (the land in dispute,) " being the same premises which *Henry Fenner* and *Margaretta*, his wife, by their indenture bearing date the 4th day of *April*, A. D. 1817, conveyed to the said *Charles Werkheiser* in fee," and praying the court to award an inquest to make partition, &c. The petition was held under advisement until the next term, when the court awarded an inquest, but no inquisition was held, and no further proceedings took place.

Judge Huston overruled the objection, and permitted the plaintiff to give his title in evidence.

After having given in evidence an application by *Henry Woolery*, dated *March* 7th, 1786, for two hundred and eighty acres of land, including an improvement; a warrant of the same date, and a survey of the 23d *October*, 1795, of two hundred and fifty acres and a half, and allowance, returned into the surveyor-general's office on the 26th *March*, 1805, proved, that in the year of 1802, *John Fenner* entered into an article of agreement with *Henry Woolery*, for the purchase of this land, and immediately after assigned the agreement to his brother *Barnet Fenner*. When the article of agreement was drawn, *Woolery* refused to execute it, unless some money was paid, upon which *Barnet Fenner* paid him five dollars, and the payment was endorsed upon the agreement. The article of agreement was lost after the death of *Barnet Fenner*, but the contents of it were given in evidence, from which it appeared, that the purchase money was one thousand pounds, of which two hundred dollars were to be paid down, and one hundred dollars every year until the whole was

paid. *Woolery* was to convey a title to *John Fenner* in about five years after the first payment.

It was also proved, that in the spring of 1803, *Barnet Feuner* took possession of the place, and paid part of the purchase money. During the summer he cleared some land, built a stable, and made a chimney to the house. He put *Charles Werkheiser* on the land, who helped to clear, plough, and sow it, but *Fenner* managed the property himself. *Charles Werkheiser* continued to reside upon it, until he died in the year 1827. *Barnet Fenner* left two children, viz. *Henry* and *Margaret*, the wife of *Charles Werkheiser*, who died soon after her father.

*Barnet Fenner*, at the time of his death, had not paid more than one hundred dollars on account of the purchase from *Woolery*. After his decease, *Henry Fenner* and *Charles Werkheiser* and his wife made a division of his property. By the arrangement between them, *Henry Fenner* was to pay his father's debts and maintain his mother. He was to take a tract of land containing upwards of two hundred and thirty acres, with a stone grist-mill and saw-mill erected on it, and *Werkheiser* was to take the *Woolery* place, *Henry* having offered him the choice of the two, and he having chosen the latter. On the 26th *January*, 1804, an article of agreement founded upon this arrangement, was entered into between *Henry Fenner* and *Charles Werkheiser*. *Henry Fenner* gave his bonds to *Woolery* for the balance of the purchase money, which remained due, according to the terms of the original agreement; but as *Fenner* wished to have a deed before *Woolery* was bound to give it, he anticipated several payments, went with *Woolery* to *Lancaster* to assist him in procuring a patent for the land, which was obtained on the 26th *March*, 1805, and on the 29th of the same month received a deed from *Woolery*. *Henry Fenner*, who was examined as a witness on behalf of the plaintiff, swore that there was no alteration in the original agreement with *Woolery*, nor any new bargain made between himself and *Woolery* but as he refused to execute a deed sooner than had been agreed, unless the money were paid sooner, *Fenner* anticipated the payments in order to get a deed. From the evidence of *Henry Fenner*, it appeared that the arrangement respecting the division of *Barnet Fenner*'s property took place at his house, and that *Werkheiser*'s wife and her mother were in the house at the time, and that *Werkheiser* and wife executed a release to him. While *Henry Fenner* was under examination, the defendants' counsel proposed to ask him the following question : " Were Mrs. *Werkheiser*, the wife of *Charles Werkheiser*, and *Magdalena Fenner*, the widow of *Barnet Fenner*, present with you and *Charles Werkheiser* on all occasions, of which you have spoken, after the death of *Barnet Fenner*, and did they not participate in all that occurred ?" This question was objected to by the plaintiff's counsel, and overruled by the Judge, who noted an exception to his opinion.

When the plaintiff had closed his evidence, the defendant, after

having given in evidence the patent to *Woolery* already mentioned, the deed from *Woolery* to *Henry Fenner*, of the 29th *March,* 1805, a deed for the same premises from *Henry Fenner* to *Charles Werk-* *heiser,* dated the 4th *April,* 1817, and a release dated the 3d *Febru-* *ary,* 1804, from *Magdalena Fenner,* the widow of *Barnet Fenner,* and *Charles Werkheiser* and *Margaret,* his wife, to *Henry Fenner,* made an offer in writing to prove, " *That Charles Werkheiser, when he married Margaret Fenner, had between three hundred and fifty and four hundred dollars in money: That he bought on his marriage the necessary household goods: That he lived with and worked for Barnet Fenner for a period of about six years previous to the contract being entered into for the purchase of the Woolery tract: That on the removal of James Chestnor, (who had been Woolery's tenant,) in the spring of 1803, Charles Werkheiser went into possession of the Woolery tract, of which there were then but a few acres cleared, and those only partially—the buildings on which consisted of an old cabin without a chimney: That Charles Werkheiser cleared between that time and the time of his death about one hundred and thirty acres of the said tract, and reduced it from a state of wilderness and underwood to a fine state of cultivation: That he in a great measure cleared the farm from stones, made stone fences round the fields, limed and improved the farm: That he built two houses, repaired the barn, and built an addition to it; built a two story stone spring-house, a cider-house and cider-press upon it, and in fact expended the whole labour of his life upon the property: That after the decease of his first wife, he married Margaret Stroh, now Werkheiser, one of the defendants, by whom he received a sum of money amounting to about*

dollars, *all which together with his own patrimony went to the improvement of this property: That the personal property of Charles Werkheiser is insufficient for the payment of his debts, most of which were incurred in the improvement of the property in dispute, and that the defendants, who are minors, are the children of the said Charles Werkheiser.*

" That *Barnet Fenner* did not pay the purchase money agreed on between *John Fenner* and *Woolery* according to the contract, and after his death a new agreement was made between *Woolery* and *Henry Fenner,* by which he sold the property to *Henry Fenner,* who received a legal title therefor, which has been regularly transmitted to *Charles Werkheiser:* That *Charles Werkheiser,* in his life time, always treated the property as his own, and after his death *George Werkheiser,* the plaintiff, styling himself the oldest son and heir-at-law of the said *Charles Werkheiser* deceased, presented his petition to the Orphan's Court of *Northampton* county, setting forth, that the said *Charles Werkheiser* deceased, died on the 25th *December,* 1827, seized in his demesne as of fee of and in the premises in dispute, which it is stated in the petition, were conveyed by *Henry Fenner* to the said *Charles Werkheiser,* his heirs and assigns in fee by the deed already given in evidence: and praying the court to award an

inquest to made partition of the said premises to and among the children and representatives of the said intestate in such manner and in such proportions as is directed by the laws of this commonwealth, &c.; which inquest was awarded by the said court to make partition of the premises to and among the widow and all the children of the said deceased. (*Prout,* the said partition and record made a part of the offer.)"

The plaintiff's counsel objected to the evidence thus offered, and the Judge rejected so much of it as is printed in *italics.* The counsel for the defendants excepted to his opinion, and the exception was noted.

The defendants then examined a witness who swore, that he heard *Henry Fenner* say, that *Woolery* wanted his money faster than it came due by the payments, and therefore they made a new bargain, that he might get it faster. They then called *Jacob Anglemoyer,* and offered to prove by him, " that on the day, on which the sheriff served the writ in this case, he had a conversation with *Henry Fenner,* in which *Fenner* told him, that *George Werkheiser* had told him he had no right to make a deed for the property in dispute after his mother's death : that he told *George,* he could not help it : he was bound to make *Charles Werkheiser* a good title, and if the title was not good, he was bound to make it good." This evidence was also objected to by the plaintiff's counsel, and overruled by the Judge, to whose opinion an exception was taken.

The defendants closed their case by giving in evidence the record of the proceedings in the Orphan's Court already referred to, and reading the record of this suit, which was commenced on the 26th *June,* 1828.

The cause was submitted without argument to the jury, who under the direction of the court found a verdict for the plaintiff.

The defendants moved for a new trial, for which their counsel filed the following reasons :—

1. The court erred in rejecting the evidence offered by the defendants to prove, that upon all the occasions after the death of *Barnet Fenner* deceased, whereat any of the transactions relative to the arrangemant of his estate took place, Mrs. *Werkheiser,* the wife of *Charles Werkheiser,* and *Magdalena Fenner,* widow of *Barnet Fenner,* attended with *Charles Werkheiser, Henry Fenner* and his wife, and participated in all that occurred.

2. The court erred in rejecting the evidence contained in the written offer of the defendants.

3. The court erred in rejecting the evidence offered to be given by *Jacob Anglemoyer.*

4. The court erred in charging the jury, that the plaintiff, under the evidence in the cause, was entitled to recover, and the following reasons are assigned why he should not recover :

1st. Because a perfect legal title to the premises in dispute was

(Werkheiser *v.* Werkheiser and others.)

shown in *Charles Werkheiser*, which at his death descended to the plaintiff, and the infant defendants, in common, subject to the dower or thirds of his widow, one of the defendants.

2nd. That this was a family arrangement, made with the approbation of all the persons interested.in the estate of *Barnet Fenner*, deceased, and it was against equity to permit the plaintiff to recover.

3d. That by the proceedings in the Orphan's Court of *Northampton* county at *January* and *April* sessions, 1828, *George Werkheiser*, the plaintiff, is estopped from maintaining this action, or from denying that *Charles Werkheiser* was in his life time seized in his demesne as of fee of the property in dispute, and died seized thereof intestate, and that the same descended to all his children, in common.

4th. That, if as is supposed on the part of the defendants, the legal title to seven eighths of the property in dispute is in the defendants subject to an equity of the plaintiff, that equity should have been satisfied before the plaintiff could recover.

The motion for a new trial was overruled, and the defendants appealed to the Supreme Court.

*Brooke* and *J. M. Porter*, for the defendants. When *Woolery* entered into the agreement with *John Fenner*, he had not perfected his title to the land in dispute. This agreement was not carried into effect in the lifetime of *Barnet Fenner*, and no title was ever vested in him. This is proved by no trust being mentioned in the patent or in the deed from *Woolery* to *Henry Fenner*. The legal title was clearly vested in *Charles Werkheiser* by reason of the patent to *Woolery*, his deed to *Henry Fenner* and *Fenner's* deed to *Werkheiser*. *Duer* v. *Boyd*, 1 *Serg. & Rawle*, 214. *Moody* v. *Vandyke*, 4 *Binn.* 31.; and his *bona fide* vendee would have been entitled to hold the land discharged of the supposed trust. The legal title is, therefore, clearly vested in all his children. But the defendants have also an equitable title. *Woolery*, when he contracted to sell to *Fenner*, had not paid the purchase money, and received a patent, and consequently had no title against the Commonwealth. *Barnet Fenner*, who was the common ancestor of the plaintiff and the defendants, paid at the outset, but five dollars towards the purchase money, and immediately put his son-in-law in possession of the land. He failed altogether to comply with his contract, and the rule is, that if the vendor put the vendee in possession, and the contract is not complied with, the vendor may maintain ejectment. *Mitchell's Lessee* v. *De Roche*, 1 *Yeates*, 12. *Woolery* therefore might have brought an ejectment against *Fenner*, and recovered the possession, and he did what was equivalent to it. The contract was rescinded by the consent of every one, who was interested in it, the wife of *Charles Werkheiser*, among the rest, who was perfectly competent to do what she did. *Jourdan* v. *Jourdan*, 9 *Serg. & Rawle*, 268. 276. *Share* v. *Anderson*, 7 *Serg. & Rawle*, 43. *Reed* v. *Morrison*, 12 *Serg. & Rawle*, 18. The original agreement being thus at an end, *Henry Fenner*, who had made a new contract

with *Woolery,* covenanted to make *Werkheiser* a good deed, and *Werkheiser* executed a release to him, the consideration for which was one thousand pounds, and other considerations, namely, the division of the personal property of *Barnet Fenner,* and the payment by *Henry* of the debts of his father.   The *Woolery* tract was not mentioned, which is an important feature in the transaction.   The error of the judge, who tried the cause, was in assuming that the property belonged to *Werkheiser's* wife.   This was not the case.   She had no interest in it, for a new arrangement took place, to which she was a party, by which her interest, if she ever had any, was divested.   The title was in *Henry Fenner,* by whom a new contract was made after the death of his father, who had not complied with the terms of his agreement, and it afterwards was vested in *Werkheiser* himself without his wife, by *Fenner's* deed to him.   If the arrangement, which took place after the death of *Barnet Fenner,* was not binding in every respect, it was void altogether, and then the property instead of descending to Mrs. *Werkheiser* alone, descended to her and her brother *Henry Fenner,* as tenants in common; and on this ground there should be a new trial.

Having the legal title, before the property can be swept away by the plaintiff upon equitable grounds, he must do equity by compensating the defendants for what has been expended upon it by their father.   *Charles Werkheiser* expended in the improvement of this farm, his own patrimony, and the labour of his whole life.   He married again, and received a large sum with his second wife, which also went to the improvement of this property.   It is equity, therefore, that before the plaintiff shall be permitted to take away what he claims as his mother's land, he should reimburse his brothers and sisters, their mother's money, which has gone to the improvement of that land, as well as the labour and expenditure of their common father, who made these improvements under the belief that the property was his own, and would descend to all his children.   If the defendants are really trustees for the plaintiff, the rule of equity applies, that the *cestuy que trust* must refund to the trustee the value of all the permanent improvements he has made, unless there has been fraud, which is not to be imputed without evidence in any case, and still less is it to be presumed, a father has defrauded the son.   The questions as to the nature and extent of the improvements, the means by which they were made, and the design in making them, were for the jury, and the court did wrong in refusing permit the evidence in relation to these facts to go to them. *Peebles* v. *Reading,* 8 *Serg. & Rawle,* 494.

The plaintiff was estopped by the proceedings in the Orphan's Court, in which he refers as the foundation of his petition, to the very deed under which the defendants claim.   The Orphan's Court is a court of record, and all that is transacted in it and entered on its records, is matter of record.   *M°Pherson* v. *Cunliffe,* 11 *Serg. & Rawle,* 429.   There are three kinds of estoppel.   1. By matter of

(Werkheiser *v.* Werkheiser and others.)

record. 2. By matter in writing. 3. By matter without writing. In this case the estoppel was of the first and highest description. A man may be estopped even by a recital, which does not present a case, by any means so strong as this, in which a direct averment is made upon the record of facts, which the party, who made it, now endeavours to contradict. This the law will not permit. *Arch. Civ. Pl.* 318. *Co. Litt.* 352. *Cro. El.* 756. 10 *Vin. Ab.* 422. 455. *Moore,* 420. *Raynsford* v. *Smith, Dyer,* 196, *note a. Cutler* v. *Dickinson,* 8 *Pick.* 388. *Anderson's Appeal,* 4 *Yeates,* 35. *Martin* v. *Ives,* 17 *Serg. & Rawle,* 364.

The court declined hearing *Hepburn* and *Jones* on behalf of the defendants.

The opinion of the court was delivered by

Ross, J.—The question for our decision is, whether the proceedings in the Orphan's Court estopped the plaintiff from showing his title. The petition and facts set forth in it amounted to no more than an admission, which under some circumstances, might be of little or no weight; but which, if made under other circumstances, might be of great weight and importance. They, however, never could operate as an estoppel. If a man institute a suit, and has made an error in declaring, or in the parties to the action, he may discontinue it, and proceed in such other form as the nature of his case may require, without being estopped, even though the second suit be founded upon a cause of action different from the former, and denying the allegations in the first declaration. Such allegations would indeed, in most cases, operate very slightly, if at all, against · him. Nothing more was done in this case. The plaintiff committed an error in presenting the petition, and probably upon discovering his mistake, relinquished the proceedings under it, and adopted the action of ejectment. Estoppel is quaintly defined, stopping a man's mouth from speaking the truth, 1 *Inst.* 227; and it is a principle only to be admitted in equity, when it consists with the honesty and justice of the case even in reference to records. Where the justice and equity of a case require the interference of chancery, that court does not reverse the judgment, but they decree and enforce what equity requires to be done between the parties. Even where a record is an estoppel to the party, it must be direct, and in point to the fact, which the party is estopped from proving contrary to the record. *Co. Lit.* 352. *Hume* v. *Burton, Ridg.* 25. 102. In this case, there was nothing, but a mere recital of what, at the time, the plaintiff supposed, was *Charles Werkheiser's* title. Rehearsal is not estoppel. 10 *Vin.* 555. *Pl.* 7. If a man recite by indenture, that whereas he holds certain land of the lease of his father, and he releases to him in fee, yet he may afterwards say, that the lessee had not any estate, upon which the release might move, for that it is but a recital. 10 *Vin.* 455. *Pl.* 5. Many other similar cases may be found in the same book. Again, one shall not be estopped, but of that of which he

may have a traverse. *Morgan* v. *Vaughn*, T. Raym. 457-8. I believe it will not be pretended, that this inquisition could be traversed. (See 8 *Mod.* 311, 312, 313. 1 *Stra.* 610. 3 *Dan.* 272.) So if one seized in fee takes a lease of the herbage of his own land, he is not estopped from claiming the fee. 2 *Leon.* 159, *Pleadall's Case.* If on avowry for distress for rent, the tenant pray in aid claiming a lease for ten years, whereas he had a lease for sixty, his executors shall not be estopped from claiming to the end of the term against the lessor, or grantor of the reversion. *Jenk.* 275. Cases might be multiplied on this subject almost without number. I will, however, only add one or two decisions made by the courts of our own country. In the case of *Owing* v. *Bartholmew*, 9 *Pick. Rep.* 521, it was held, that where a tenant of land presented a petition to the legislature, admitting, that the land belonged to the Commonwealth, and praying that it might be granted to him, and that thereupon the land by authority from the legislature was sold to another person, the tenant was not estopped from setting up his title, but the admission in his petition, and his declaration that the land did not belong to him, amounted to no more than strong evidence against him, and that the burden of the proof rested on him to show, that such representation was founded in an innocent mistake. By an act of assembly of this state, passed the 13th of *April*, 1807, it is provided, that where two verdicts shall be given in any writ of ejectment between the same parties in succession for the plaintiff or defendant, and judgment be rendered thereon, no new ejectment shall be brought, &c. Under this act it has been held, that two verdicts are no bar to a new ejectment, if the court grant a new trial, *Ives et al.* v. *Leet et al.* 14 *Serg. & Rawle*, 301. (See 5 *Serg. & Rawle*, 410.) I have referred to this act of assembly, and the decision under it, for the purpose of showing the reluctance, with which courts adopt even the salutary provision of an act of assembly, when it operates as an abridgment of the common law, or when it is calculated to prevent an examination of the merits of the case. I also refer to the case of *Martin* v. *Ives*, 17 *Serg. & Rawle*, 365, where it was held, that estoppels whenever they produced neither hardship nor injustice, but promoted equity, should merit indulgence, if not favour. In the present case great injustice would probably be done, if the petition were suffered to operate as an estoppel and preclude the plaintiff from giving his title in evidence. I am clearly of opinion, that the admission of the evidence was correct and authorised by every principle of law and equity.

With respect to the other errors assigned, there certainly cannot be a legal doubt entertained of the correctness of the decision of the court below. The evidence offered by the defendant was properly rejected; because it was an attempt to make out a title by parol, without any evidence of part performance. It is true, that where a plaintiff claims under an equitable title, he shall do equity before he shall be permitted to recover. When the defendant has acted

honestly and with good faith, he is entitled to be reimbursed the money laid out in perfecting the title, or in making improvements; but if he has been guilty of *mala fides*, and has endeavoured to defraud the plaintiff, he is not entitled to the benefit of this wholesome principle; or if he be entitled to it, it is only to such balance as may appear to be due after deducting the rents, issues and profits during the time of his enjoyment of the land. Of this he should render an account, and in some cases chancery would direct the master to ascertain the same. In this case, the defendant claimed the absolute fee simple, and would have fraudulently defeated the object of the trust, if it had been in his power to do so. He, therefore, cannot bring himself within the principle referred to. Many important principles applicable to this case will be found laid down by Chancellor KENT in *Vanhorne v. Fonda*, 5 *Johns. Chan. Rep.* 388, a note of which case will be found in 11 *Serg. & Rawle*, 427.

Upon the whole, we are of opinion, that the errors assigned have not been made out, and direct the judgment to be affirmed.

Judgment affirmed.